UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ARTHUR STARR,                                          :
                                                      :
                              Plaintiff,              :
                                                      :
              -against-                               :      **COMPLAINT**
                                                      :
NEW YORK UNIVERSITY, GRETA                            :      **JURY TRIAL DEMANDED**
SCHARNWEBER, and HELGA TAWIL-SOURI,                   :
                                                      :
                              Defendants.             :
------------------------------------------------------------------X

Plaintiff Arthur Starr ("Starr" or "Plaintiff"), by his attorneys Pechman Law

Group PLLC, complaining of Defendants New York University ("NYU"), Greta

Scharnweber, and Helga Tawil-Souri (collectively, "Defendants"), alleges:

## NATURE OF THE ACTION

1.      This action is brought pursuant to the anti-discrimination provisions of

the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Family and

Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the New York State Human

Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human

Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*  ("NYCHRL").

2.      Starr worked for NYU at the Hagop Kevorkian Center for Near Eastern

Studies ("Kevorkian Center"), which was created in 1966 to foster interdisciplinary

study and understanding of the Middle East.

3.      As a Program Coordinator, Starr advanced the mission of the Kevorkian

Center by, among other things, overseeing and organizing events, working with

graduate students, and helping with the administrative needs of the Center.

4.      After five years of work at the Kevorkian Center, Starr was terminated

because of his cervical dystonia, a degenerative neurological disability, and his use of

the intermittent FMLA leave he was granted to manage his disability. Starr's condition was exacerbated by stress and required that he periodically take time off from work for treatment. Despite NYU's ongoing knowledge of Starr's situation, he was discouraged from utilizing the FMLA leave time and was targeted and retaliated against for taking FMLA leave to arrive to work later in the day or taking days off from work due to his disability. Starr's condition was particularly severe in the weeks leading to his termination due to his mother's terminal cancer diagnosis. In fact, she died three days after NYU fired Starr.

5.      Due to his discriminatory and retaliatory termination, Plaintiff brings this action for injunctive and declaratory relief, compensatory, punitive, and liquidated damages, pre- and post-judgment interest, attorneys' fees and costs, and other appropriate equitable and legal relief.

## JURISDICTION

6.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f)(1), and 29 U.S.C. § 2617(a)(2), and has supplemental jurisdiction over Plaintiff's claims under the NYSHRL and the NYCHRL pursuant to 28 U.S.C. § 1367.

7.      Pursuant to Section 8-502(c) of the New York City Administrative Code, Plaintiff shall, within ten days of its filing, serve a copy of this Complaint to designated city representatives.

8.      Starr filed a claim with the New York City Commission on Human Rights ("NYCCHR") on September 13, 2016, which was cross-filed with the Equal Employment Opportunity Commission ("EEOC") and dismissed for "administrative convenience" by the NYCCHR on December 4, 2017.

2

9.      The EEOC issued Starr a Notice of Right to Sue on February 8, 2018, which he received on February 14, 2018.

## VENUE

10.      Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 because the Kevorkian Center, where Starr worked, is located at 50 Washington Square South, New York, NY 10012, in the Southern District of New York.

## THE PARTIES

**Plaintiff**

11.      Starr resides in Queens, New York.

12.      Defendants employed Starr as a Program Coordinator for the Kevorkian Center from June 2011 through February 10, 2016.

13.      At the times he applied for FMLA leave, Starr had been employed by NYU for more than twelve months and had worked at least 1,250 hours during the previous twelve-month period.

**Defendants**

**New York University**

14.      NYU is a non-profit corporation organized under New York law with its principal place of business in New York, New York.

15.      NYU is one of the largest private universities in the United States, with revenues over three billion dollars and more than 19,000 employees.

16.      Plaintiff worked for NYU at the Kevorkian Center, one of the dozens of academic centers and institutes within NYU.

17.       At all relevant times, NYU has been engaged in commerce or in an industry affecting commerce and has employed fifty or more employees for each

3

working day during each of the twenty or more calendar workweeks in the relevant calendar year.

**Defendant Greta Scharnweber**

18.     Upon information and belief, Greta Scharnweber ("Scharnweber") resides in New York, New York.

19.     Throughout Starr's employment at NYU, Scharnweber worked as the Kevorkian Center's Associate Director and Outreach Coordinator.

20.     During Starr's employment, Scharnweber was an agent of NYU.

21.     Scharnweber had the authority to, and did, exercise control over Starr's work duties and schedule.

22.     Scharnweber directly supervised Starr during his employment by Defendants.

23.     Scharnweber regularly gave Starr assignments and tasks to complete.

**Defendant Helga Tawil-Souri**

24.     Upon information and belief, Helga Tawil-Souri ("Tawil-Souri") resides in New York, New York.

25.     In or about January 2015, Tawil-Souri became the Director of the Kevorkian Center, Scharnweber's direct supervisor.

26.     During Starr's employment, Tawil-Souri was an agent of NYU.

27.     Tawil-Souri had the authority to, and did, exercise control over Starr's work duties and schedule.

28.     Tawil-Souri directly supervised Starr during his employment by Defendants.

29.     Tawil-Souri regularly gave Starr assignments and tasks to complete.

4

30.     Tawil-Souri and Scharnweber both requested that Human Resources approve Starr for pay raises throughout his employment.

31.     Both Scharnweber and Tawil-Souri conducted official evaluations of Starr's performance at different times throughout his employment.

32.     Scharnweber and Tawil-Souri met with Starr together on February 10, 2016 and terminated his employment.

## FACTS

**Plaintiff's Educational and Employment History**

33.     Starr received a Bachelor of Arts in International Affairs from the George Washington University in 2000, as well as a Master's degree in Middle Eastern Studies from The Graduate Center, City University of New York ("CUNY Graduate Center") in 2011.

34.     Prior to working at NYU, from 2008 to 2011, Starr was a Program Assistant for The Middle East and Middle Eastern American Center at the CUNY Graduate Center.

35.     Starr began a doctoral program at NYU in 2012 and is pursuing an Ed.D. in Higher Education Administration.

36.     Tawil-Souri's predecessor as Director of the Kevorkian Center, Michael Gilsenan ("Gilsenan"), hired Starr to work at the Kevorkian Center in June 2011.

37.     Starr's duties as Program Coordinator at the Kevorkian Center included leading the recruitment and admissions process for students seeking to study at the Kevorkian Center, administering the Kevorkian Center's budget, and reviewing the Kevorkian Center's practices to ensure compliance with NYU policies.

38.     Starr helped secure numerous grants for the Kevorkian Center.  For example, he secured research grants from the National Security Agency each year from 2013 to 2016.

39.     Starr was nominated for the NYU Distinguished Administrator Award in 2014, 2015, and 2016.  The award "recognizes outstanding administrative and professional performance that helps NYU meet its strategic initiatives and contributes to the attainment of the University's goals."  NYU informed Starr each time that he was nominated.

40.     Each year of his employment at NYU, Starr was subject to annual reviews and received the highest or second-highest rating available.

**Plaintiff's Disability and FMLA Leave**

41.     Starr has chronic back pain and cervical dystonia, a degenerative neurological condition that causes uncontrollable tremors, primarily in the head and neck and extending to the arms, hands, and feet.

42.     The tremors caused by cervical dystonia are exacerbated by stress and fatigue.

43.     Starr's cervical dystonia requires him to obtain continuing treatment by his healthcare provider.

44.     The treatments and medications Starr utilized to address his cervical dystonia have caused him to experience side effects, including migraines, sleeplessness, and difficulty breathing and swallowing.

45.     Within the first month of his employment at NYU, Starr began to suffer from intense neck pain.

6

46.     Around October 2011, after multiple misdiagnoses, Starr visited a neurologist who diagnosed him as having cervical dystonia.

47.     Starr immediately informed Gilsenan and Scharnweber of his condition.

48.     Starr also suffered from chronic back pain, which worsened while working at NYU due to the sedentary nature of the job.

49.     Starr also informed Gilsenan and Scharnweber of his back-pain issues.

50.     Starr threw out his back several times per year from 2012 to 2014.

51.     Although Starr frequently suffered pain due to his cervical dystonia and chronic back condition, he was able to manage the pain and continue working without any accommodations throughout his first few years at NYU.

52.     After approximately three years at NYU, when his conditions worsened, Starr applied for intermittent FMLA leave as an accommodation for his chronic back condition.

53.     NYU determined that Starr suffered from a "serious health condition" and met the other FMLA leave eligibility requirements and approved his leave request.

54.     NYU approved Starr to take intermittent FMLA leave from April 2014 through April 2015.

55.     In April 2015, Starr's mother was diagnosed with advanced stage lung cancer.

56.     After her diagnosis, Starr began using accrued vacation days to attend to his mother as she navigated her illness and underwent cancer treatment, which included a surgery in May 2015 intended to remove the cancer cells in her lungs. The surgery was unsuccessful because the cancer had spread further than the doctors initially realized. Complications during and after the surgery forced Starr's mother to

7

be hospitalized regularly at the South Nassau Community Hospital's Intensive Care Unit throughout fall 2015.

57.     Starr's cervical dystonia tremors worsened from the stress of dealing with his mother's rapidly deteriorating condition.  By the fall of 2015, Starr was experiencing tremors so severe they sometimes outwardly appeared to be convulsive seizures.

58.     Realizing that his condition was worsening, in or about October 2015, Starr contacted the NYU Human Resources Department to discuss the possibility of applying for FMLA leave to accommodate and treat his cervical dystonia.

59.     Starr was initially unable to obtain the medical paperwork necessary to apply for FMLA leave because his neurologist was on a leave of absence.

60.     In December 2015, Starr submitted the completed application for intermittent FMLA leave.

61.     In January 2016, NYU approved the leave request, determining that Starr's cervical dystonia constituted a "serious health condition" and that Starr met all the other FMLA leave eligibility requirements.

62.     Specifically, NYU granted Starr two types of intermittent FMLA leave: (1) leave for purposes of obtaining treatment for his cervical dystonia, termed "absence plus treatment"; and (2) leave to be taken when the pain and other symptoms of his cervical dystonia prevented him from performing his job functions, termed "chronic condition" (the "CD FMLA Leaves").

63.     The CD FMLA Leave granted for "absence plus treatment" allowed Starr to be absent from work when necessary to treat his condition.  For example, Starr was permitted to take time off to go to appointments that helped treat and decrease the intensity of his tremors.

8

64.     The CD FMLA Leave for "chronic condition" allowed Starr to take time off when his symptoms were particularly severe.  For example, Starr was permitted to use the leave when the tremors were so severe that he, *inter alia*, had trouble breathing or when his medications caused debilitating migraines.

65.     NYU designated Starr's CD FMLA Leaves as running concurrently, to be taken between January 12, 2016 and January 11, 2017, and capped the amount of intermittent leave time Starr could take at 72 hours per month.

66.     Starr began using his CD FMLA Leaves as soon as they were approved, to deal with his worsened condition.

67.     Starr documented his full- and partial-day CD FMLA Leave absences in NYU's "MyTime" program, which NYU uses to track employee work hours, and/or sent emails or SMS messages to Scharnweber and Tawil-Souri whenever he was going to be out of the office.

**Defendants' Unlawful Interference and Discriminatory Practices**

68.     Despite Defendants' ongoing knowledge of Starr's cervical dystonia and although Starr had been approved for CD FMLA Leaves, Defendants discouraged him from taking that leave and retaliated against him when he continued to take approved leave.

69.     Scharnweber and Tawil-Souri repeatedly targeted Starr for taking morning hours or days off from work, unlike their treatment of non-disabled Kevorkian Center employees, because Starr's leave was due to his disability.

**A. Starr's Probationary Period**

70.     On October 29, 2015, shortly after Starr began inquiring into the possibility of applying for the CD FMLA Leaves, Tawil-Souri and Scharnweber held a meeting

9

with him to discuss their concerns regarding Starr's alleged frequent latenesses and

absences.

71.     On October 30, 2015, Tawil-Souri sent an email to Starr with a written list

of the concerns that were discussed at the previous day's meeting.  The comments in

Tawil-Souri's talking points highlight the discriminatory animus of Tawil-Souri and

Scharnweber:

> Main areas of concern are: 1) predictability (surprise element of
> when/if you will show up); 2) regularity (punctuality, keeping
> regular business hours); 3) reliability (not sure if you will show up,
> whether you will see responsibilities through, do so in time and
> without follow-up); 4) frequency of your absences (whether full
> days, half days, or late days); 5) how all of these reflect on your and
> Center's professional comportment . . . . Your time out of the office
> is un-predictable, recurring, and un-manageable. Counter to
> business needs. I understand that you have many issues to contend
> with, but this does not change the need for Center to rely on you to
> be here, to complete your work, to be a partner in the Center . . . .
> Ongoing unpredictability and recurrent absences/latenesses are
> frustrating to all staff and running of the Center. We notice a
> momentary improvement after a discussion but quickly falls back
> into unpredictable pattern.  Sets a bad example to other staff
> members and all the Center interacts with (students, faculty, other
> administrators, etc.). Does not reflect professionalism important to
> the Center . . . . Both Greta and I feel that when we ask for
> something within a specific time frame, that we have to assume that
> the deadline will be ignored and that reminders will be needed to
> get whatever it is we've asked for. Need you to be focused, provide
> work in a timely and reliable fashion.  Greta, myself and other staff
> members have constant conversations about whether you will
> show up and when, which get in the way of our work and make for
> a stressful, frustrating and unpleasant work-environment. Is he
> here? Has he shown up yet? Is he coming today? Have you heard
> from Arthur? Is he going to be here tomorrow? etc. . . . . Because of
> absences, we question whether when you are here, you are here
> 100%.  Because of absences, Greta and I question whether you are
> working on what is a priority (e.g. financial reports, training new
> employees, gathering data, student and course matters, visas and
> payments, etc.) rather than what may be secondary (getting stuff
> from the bookstore, stocking up coffee, helping faculty with
> computer issues, etc.). If you were here regularly, this would not be
> an issue.  Because of absences, when you are here, we notice every
> time you are not at your desk and wonder what you are up to,

whether you're gone for the day, whether you will come back, whether you are attending to what needs to be done, etc. (which should not be how we operate) . . . . That we notice that you do show up before 10, or that we are surprised that you are here four days in a row speaks to how frequently the opposite is the case. That I have bothered to go through emails, ask Greta to look into your record, and take cursory look also speaks to how serious of a problem this is. Constantly being aware of someone's time in/out, latenesses, absence, etc., does not make for a supportive and pleasant environment for any of us; puts Greta and myself in position of having to police, time keep, etc.

72.     The email from Tawil-Souri also included a log of alleged absences and latenesses, most of which were either covered by Starr's FMLA leave for chronic pain, which lasted through April 2015, or accrued personal, sick, or vacation days.

73.     NYU currently affords full-time administrative employees at least twenty-two vacation days per year, of which up to eleven days may be carried over per year; two personal days per year, with no carry-over; and at least twelve sick days per year, with some carry-over allowed to following years. Starr only used a portion of his allotted sick, vacation, and personal days.

74.     NYU's policy requires that time off be requested in advance and approved by the employer, when foreseeable. Starr complied with this policy throughout his employment.

75.     Notably, not a single specific incident of any missed deadline or unsatisfactory performance was mentioned during the October 29, 2015 meeting or in Tawil-Souri's follow-up email. Rather, the meeting focused on the unpredictability of Starr's attendance – a symptom of his disability, which had intensified during the exact time period being scrutinized by Tawil-Souri and Scharnweber.

76.     At the conclusion of the October 29, 2015 meeting, Tawil-Souri stated that Starr had until the end of the semester to correct the issues she and Scharnweber had

raised.  Tawil-Souri reiterated this in her follow-up email to him on October 30, 2015.
The email read, "If there is no improvement through the end of the semester (six
weeks), we will ask for your resignation."

77.    Although Starr disagreed with the assessments made by Tawil-Souri and
Scharnweber, he adapted his work routines to meet their demands.

78.    At the end of the six-week probationary period, the week of December 10,
2015, Tawil-Souri spoke with Starr and confirmed that he had met the requirements
they put forth during the October meeting and that his job was no longer in jeopardy.

79.    Starr successfully completed the probationary period and Defendants did
not ask for Starr's resignation.

**B. Starr Takes FMLA Leave to Cope with Worsening Condition**

80.    In January 2016, Starr's condition worsened due to the extreme stress from
his mother's impending death.

81.    Starr's mother entered hospice care in mid-January 2016.

82.    Defendants approved Starr's reapplication for FMLA leave on January 12,
2016.  Starr immediately began to make use of it to treat his medical conditions, which
became so severe that he had near constant neck spasms, which interfered with basic
functions, like his ability to talk.

83.    Despite the pain he was experiencing, Starr continued to perform his
assigned work and communicated by text and email with Tawil-Souri and Scharnweber
regarding any changes to his schedule.  Starr also input his leave in the NYU "MyTime"
program.

84.     Barely one month after confirming that Starr's job was secure, Defendants began to retaliate against Starr for taking approved FMLA leave for the permissible purpose of managing his cervical dystonia.

## C. Defendants' Disparate Treatment Regarding Scheduling and Interference with Starr's FMLA Leave

85.     The rigid schedule that Defendants expected Starr to keep starkly contrasts the flexible schedules that Tawil-Souri allowed herself, Scharnweber, and other employees in the department.

86.     Scharnweber enacted "summer hours" every year since 2011, which allowed for all Kevorkian Center employees to work shortened schedules during the summer months, with flexible start and end times.  Tawil-Souri and Scharnweber nevertheless continuously questioned Starr's summer schedule and hours worked, while other employees were essentially allowed to come and go as they pleased.

87.     Starr's absences and latenesses were treated in an unsympathetic way, particularly in comparison to the breezy, laissez-faire approach Tawil-Souri and Scharnweber took when it came to their own personal needs, that of their children, and that of employees' children.

88.     Scharnweber regularly allowed Tandi Budhram, an Administrative Aide at the Kevorkian Center, to leave early, arrive late, or take days off when an issue arose regarding care for her young son.  Budhram was not scrutinized or penalized for taking leave when unexpected childcare issues arose.

89.     Throughout Starr's employment, Tawil-Souri and Scharnweber regularly arrived to work late or called after the beginning of the workday to announce that they would not be in the office that day.  They took days off from work to handle family and childcare issues on a regular basis.

13

90.     Scharnweber allotted herself a very flexible schedule after returning from maternity leave in both 2011 and 2014.  In addition to regularly taking unscheduled days off, Scharnweber worked from home on Tuesdays throughout the 2014–2015 academic year.  Tawil-Souri approved this four-day in-office workweek without seeking approval of the NYU Human Resources Department, as is standard university protocol.

91.     Occasionally, Tawil-Souri and Scharnweber sent emails to Starr and the other Kevorkian Center employees to say that they were going to be late or absent. Usually, however, they would only call or email an administrative aide, who would then inform the staff.

92.     The casual, undocumented, and irregular ways in which Tawil-Souri and Scharnweber informed the staff of their unpredictable latenesses and absences highlight their disparate treatment of Starr's attendance record.  Tawil-Souri and Scharnweber singled Starr out and discriminated against him for his own medically-necessary absences, though they regularly missed work for reasons such as the ones in the following representative sample of emails.

93.     On September 3, 2011, at 8:59 p.m., Scharnweber wrote to Kevorkian Center employees, including Starr:

> Hi folks,
>
> I just wanted to write to let you know that while I am returning to work after this weekend (even though my leave technically goes until the end of september-I am going to distribute the time over the rest of the fall semester) it is going to be a bit quirky for a while.  [My son] is too young for day care-he will begin two days a week starting October.  So for now I wanted to give you a sense of what I hope will work out for September.  I plan to keep as regular of office hours as possible on mondays and Fridays.  On Tuesdays and Thursdays I will work from home (available by phone and

14

> email). And Wednesdays i should be able to be around most
> of the afternoon.
>
> This just applies for the month of September, and it is going
> to be tough to manage it for me so we shall see.  In October
> [my son] starts tuesday-Thursday day care, so I will come up
> with a fuller schedule then.

94.     On June 26, 2012, Scharnweber wrote to Starr and Lauren Marten, an

Administrative Aide:

> Hi there,
>
> Just a note to say what I mentioned to Lauren earlier
> today. It's so quiet and boring around here--and it dawned
> on me it might not be that helpful always to do the work day
> 10-4--so feel free when you need to to adjust those hours to be
> 9-3 or 11-5.  Or so.  Easy going SUMMER HOURS!  But a
> reminder just to make sure nothing gets overlooked of our
> summer projects, ok?
>
> looking forward to the soccer match on thursday at
> DEUTCHES HAUS.

95.     On June 30, 2015, Scharnweber wrote to Kevorkian Center employees,

including Starr:

> Hi guys, I am probably not going to be coming into the office
> much today as I have [my daughter].  Maybe later this
> morning depending on her nap.

96.     On August 31, 2015, Scharnweber wrote to Starr and Sallie Wade, an

Administrative Aide:

> FYI, today (Monday) won't be in until 1, But then will be in 1-
> 5 and probably come back tonight. Tomorrow and
> Wednesday I will be in the whole day.  Taking it one day at a
> time as we juggle the kids going into this new school
> transition!

97.     On September 10, 2015, Scharnweber wrote to Kevorkian Center

employees, including Starr:

> Hi folks,
>
> Just facing reality and taking a vacation today so I can spend it properly with [my son] instead of making him sit on the floor in my office all day. We will both be here for the party of course, wouldn't miss it. I'll try to check email now and again to answer any questions.

98.     On November 17, 2015, Scharnweber wrote to Kevorkian Center

employees, including Starr:

> An illness has been going around and is wreaking havoc on my and helga's availability this week I am so sorry about this. Helga and her two kids all have something, and [my daughter] seems so far to be getting worse instead of better.
>
> We had hoped to keep our staff meeting tomorrow, but it doesn't look promising, so Let's plan to reschedule for dec 2.

99.     On November 18, 2015, Tawil-Souri wrote to Kevorkian Center

employees, including Starr:

> Apologies for not being able to make it in today -- I still have one sick kiddo (better than two I suppose). I'm going to have to go to class and come back home right after. I'll hopefully be in tomorrow!

100.    On November 19, 2015, Scharnweber wrote to Kevorkian Center

employees, including Starr:

> Hi all,
>
> [My daughter] is still with a high fever, and Arang teaches today so I have To take another sick day to stay with her. I will be in the full day tomorrow unless I am suddenly struck down by this illness. However, I suspect that won't happen until I am on the plane to MESA Saturday morning.
>
> I am available by phone (preferred if you need immediate response) or on email of course.

101.     On Wednesday January 12, 2016 at 9:10 AM Tawil-Souri wrote to

Kevorkian Center employees, including Starr, with a list of tasks for employees to

complete, stating in relevant part:

> Hi (Greta, FYI)
>
> A few requests please. Apologies, won't be able to make it to
> office today.

102.     In contrast, when Starr emailed Scharnweber on January 5, 2016, asking

for time off on either January 7th or 8th because his dying mother had been readmitted

into the hospital, Scharnweber and Starr had the following exchange:

> On Wed, Jan 6, 2016 at 1:26 PM, Greta Nicole Scharnweber
> <gs113@nyu.edu> wrote:
>
> Hi Arthur,
>
> I meant to respond earlier but only just now got a minute.  I
> can appreciate that the situation with your mother is serious,
> and hope of course that you get good news.
>
> As for the time off request, I suppose the best we can hope for
> is for you to keep us posted on your needs away from the
> office at this time vis-a-vis your mother's health.  I would also
> unfortunately have to note that this week is already looking
> like the pattern we had flagged as problematic over the past
> year...very late on Monday due to train delays, first late on
> Tuesday due to train problems and then a full absence, and
> now an uncertain day off tomorrow or Friday.
>
> Please make sure to put in the appropriate mytime requests
> for the time already taken and the upcoming time you're
> requesting as it arises.
>
> Greta
>
> On Thurs, Jan 7, 2016 at 4:52 PM, Arthur Brian Starr
> <arthur.starr@nyu.edu> wrote:
>
> HI Greta,
>
> Thank you for your note and I certainly understand your
> concerns and I hear you loud and clear. I just want to reassure

17

you that while they do seem like similar patterns, I just want to explain that first, on Monday, there were trains not moving all over Queens, Brooklyn and Manhattan with delays resulting in commuters being stuck at many stations (I was one of them in Flushing) for over 2 hours:

http://gothamist.com/2016/01/04/subway_funday_you_g uys.php?utm_source=Gothamist+Daily&utm_campaign=ea a1d12bd7-
RSS_EMAIL_CAMPAIGN&utm_medium=email&utm_term =0_73240544d8-eaa1d12bd7-1217225

And when the same thing happened again on Tuesday morning, I took your advice from last year when you said that when there were extreme train delays (at that time they were due to snowstorms) I should stay at home and work instead of showing up at work hours late (as happened on Monday).

I answered as many emails, particularly about FLAS and MA admissions, as I could as well as began collating FLAS applications. I actually came into the office late Tuesday evening because I needed to get info from my desktop for work I was doing earlier in the day from home but I couldn't access my computer, so I actually have already entered my hours into MyTime (I put in for a personal day on Tuesday because I didn't feel like I got as much work done as I could have after my sister called about my mother and I also entered sick family leave for Friday).

I know this probably does not alleviate all your concerns but I hope you can see that I did everything possible given the circumstances and tried to act responsibly and in accordance to the previous instructions/recommendations I had been given.

As a reminder, my request from Tuesday for time off is still pending. I am heading to Long Island tomorrow but cancelling my request for time off because the current circumstances don't require me to be at her oncologist appointment because it will only be palliative treatment. I might ask to leave 30 - 45 minutes early to catch a train but that's it and I'll be sure to be in touch about any future needs vis-a-vis my mother's health.

Best,
Arthur

18

On Fri, Jan 8, 2016 at 9:47 AM, Greta Nicole Scharnweber
<gs113@nyu.edu> wrote:
Arthur,

I think that because the absences and latenesses etc. have been
going on for more than a year a lot of things have been said
or communicated throughout that time that in some cases do
turn out to be contradictory because in our efforts to eliminate
the erratic attendance, I/we have had a number of different
conversations and taken different approaches to work with
you on fixing it. Of course, sometimes the train really is super
late and it's not your fault and this may have been the case
this week. The frequency is the issue: it can't always be the
train, and if it really is, then you need to start your commute
earlier so that you are not forced to be notifying us about train
delays constantly--this way when there is a true breakdown
of the trains, it is believable and understandable.

I think at the present moment, and for the sake of absolute
clarity, we need to go with the assumption that we expect you
to be here working during normal business hours unless there
is a true emergency (which would be communicated to Helga
and I as soon as you know it is happening) or unless we have
agreed to the time off in advance.

Thank you for putting in the mytime request for Tuesday. I
approved it this morning. I see there is a separate vacation
time request that falls unfortunately in the first week of
school: January 28-29. Can you provide more information as
to why you need this particular time off?

Greta

On Fri, Jan 8, 2016 at 10:04 AM, Arthur Brian Starr
<arthur.starr@nyu.edu> wrote:

Hi Greta,

Sounds good and clear, thanks.

Those are the dates I mentioned in our last department
meeting as the only days I would need off for January for my
bachelor party-my friends and cousins are taking me to
Montreal.

Best,
Arthur

19

103.   Scharnweber's January 6, 2016 email to Starr stated that she supposed "the best we can hope for is for you to keep us posted on your needs away from the office at this time vis-a-vis your mother's health" but then criticized Starr's recent time off and lateness, despite knowing the reasons for each occurrence.

104.   Starr responded to Scharnweber and further explained the situation, but was met with additional hostility, including the statement that he should only be out for "a true emergency." Despite stating this requirement, Scharnweber did not define what a true emergency entailed.

105.   Scharnweber's emails did not point to any work that was negatively impacted by Starr's time off.

106.   On January 21, 2016 the Kevorkian Center was closed to allow employees to attend an afternoon staff retreat. All employees had the morning off from work. Starr went to an appointment with a therapist during his free morning, in an effort to cope with the stress of his mother's impending death. This appointment was scheduled during his time off but was also notably within the parameters of his FMLA leave for treatment of cervical dystonia as the main purpose of the appointment was to decrease stress, which exacerbates his condition.

107.   The Kevorkian Center staff retreat was scheduled to start at 12:30 p.m. Starr sent an SMS message to Tawil-Souri informing her that because his appointment ran late, he would be arriving to the opening session of the retreat (a communal lunch) a few minutes late. He wrote, at 12:36 p.m.:

> Hi Helga. I'm still about 5 min away. I'm sorry I'm running late. I decided to start seeing a therapist who specializes in family members with terminal cancer and she had an 11:00am appointment today. I didn't realize I would have to wait so long before my appointment. Please accept my apologies.

> You can obviously share with Greta but please dont mention
> therapy to the rest of the office.  I'll be there shortly.

108.    The next working day, Tawil-Souri reprimanded Starr for arriving late to the retreat lunch.  Starr began to explain that he had contacted her and that he was late because he had used his FMLA leave for a therapy appointment.  Tawil-Souri cut him off and said, "I don't give a fuck why you were late.  Everyone else was able to come on-time."

109.    Tawil-Souri's profane statement puts Starr's lateness in the same category as all other employees, despite the fact that he had utilized approved intermittent leave appropriately: to address the often erratic symptoms of his chronic disability.

110.    Starr's lateness to the communal lunch did not negatively impact his work duties.

111.    Due to the pressure Defendants exerted on Starr, which culminated in Tawil-Souri's reprimand, he felt that he should not use the FMLA leave time he was entitled to, even though he was regularly in significant pain.

112.    Scharnweber and Tawil-Souri's reprimands conveyed to Starr that his job was in jeopardy for taking time to treat his condition and care for his dying mother.

113.    On at least one occasion, Starr went into work while suffering from severe spasms, despite knowing that he should be resting to try and lessen the worsening spasms.

### D. Defendants' Discriminatory and Retaliatory Termination of Starr and Pretextual Justifications

**Alleged Insubordination**

114.    On January 8, 2016, Starr, Scharnweber, and Tawil-Souri began corresponding via email regarding the acquisition of a computer for a new employee, Diana Shin ("Shin").

115.    Starr, Scharnweber, Tawil-Souri, and Shin received all of the emails regarding Shin's computer.

116.    At 10:55 AM on January 8, 2016, Scharnweber wrote an email to Starr, Tawil-Souri, and Shin, stating that it would be preferable to wait until the summer to buy a laptop computer for Shin.

117.    At 11:09 AM on January 8, 2016, Starr replied to the email agreeing that it would be best to wait until the summer before purchasing the laptop computer.  He also wrote that he might be able to speak with the IT Department and get a free desktop computer for Shin to use in the meantime.

118.    At 11:18 AM on January 8, 2016, Shin replied to Starr's email stating that she would wait until the summer for the laptop computer but would like to use the desktop computer in the meantime.

119.    Neither Scharnweber nor Tawil-Souri responded to Starr or Shin's emails, though they were both copied as recipients on the messages.

120.    At 3:42 PM on January 11, 2016, Starr sent a follow-up email stating that he was, in fact, able to procure a desktop computer for free that Shin could use "until you get your laptop this summer."

121.    Later that day, Tawil-Souri reprimanded Starr because he secured the free computer for Shin.

22

122.    Tawil-Souri claimed that Starr's acquisition of the free computer constituted insubordination.  However, neither Tawil-Souri nor Scharnweber never disagreed with Starr's initiative to obtain the free computer during their earlier email exchange, and Starr's actions did not run contrary to any NYU policy or practice.

123.    In fact, one of Starr's job duties was to procure resources and approve of department purchases.  During his tenure at NYU, Starr purchased multiple computers, video cameras, and other technology items for the Kevorkian Center and was not previously required to get prior approval for such purchases.

124.    Starr was not insubordinate.  Rather, Defendants seized this opportunity to, without basis, find fault in his actions due to their animus against his disability and use of his FMLA leave.

**Alleged Violation of NYU Policy**

125.    In January 2016, Tawil-Souri reprimanded Starr for allowing a student to help him complete administrative tasks related to student admissions, claiming that Starr violated an NYU Policy by doing so.

126.    There is no NYU policy against utilizing student assistance for administrative admissions tasks.  Indeed, it is common practice at NYU to use both undergraduate and graduate student workers to assist in the admissions process.

127.    On more than one occasion, Starr observed Scharnweber utilize student workers to assist with admissions projects that included sensitive student information.

128.    Starr took specific precautions to ensure that the student who helped with the assignment did not have access to any restricted data.

129.    Starr erased all of the personal information on the spreadsheet that was used by the student, so that it was blank except for the headings.  Once the student

completed his assigned task, Starr transferred ownership of the document to himself, so the student would not have any access to it after it was repopulated with student-related information.

130.    Neither Tawil-Souri nor Scharnweber identified any errors in the work that Starr completed using student assistance.

131.    Scharnweber and Tawil-Souri's unjustified reprimand of Starr was pretext for their discrimination against Starr's use of leave to manage his disability.

**Starr's Final Weeks of Employment and His Termination**

132.    On or about Thursday, February 4, 2016, Starr informed Tawil-Souri that his mother was dying of cancer and would likely pass away within the week.  Starr stated that upon her passing he planned to use the three days of bereavement leave that NYU provides to employees.

133.    Starr's tremors intensified throughout February in response to the stress of his mother's worsening condition and the stress of having any latenesses or absences questioned and criticized by Tawil-Souri and Scharnweber.

134.    On Tuesday, February 9, 2016 at 8:51 AM, Starr sent an email to Tawil-Souri and Scharnweber with the subject "FMLA Leave" stating, "I am going to be 25-30 min late this morning."  He received no response.

135.    Scharnweber communicated with Starr via email after he arrived to work on February 9, 2016, asking if he completed the registration for an upcoming workshop. Starr confirmed that he had already completed the task.

136.    On Wednesday, February 10, 2016 Starr emailed Tawil-Souri and Scharnweber with the subject "FMLA Leave" stating, "I am going to be 30 min late this morning."  He followed up that email with communications to Scharnweber at 10:16

24

AM and 11:35 AM stating that he needed more time and would be in later that morning. His final email to Scharnweber said, "Sorry the seizures were bad this morning. I'm just leaving and will be in by 12:15pm at the latest." Starr received no response to these emails.

137.    Upon Starr's arrival to work on February 10, 2016, he was told to attend a meeting at 4:30 PM with Tawil-Souri and Scharnweber. At the meeting, Starr was told that he was being terminated. Tawil-Souri also insisted that regardless of what Starr said at the meeting, he would not be returning to work.

138.    Starr's mother died three days later, on February 13, 2016.

139.    Starr was not terminated due to work performance issues but because of latenesses and absences taken pursuant to the FMLA and which were directly tied to both his disability and his mother's cancer diagnosis and treatment.

140.    Tawil-Souri and Scharnweber fired Starr despite knowing that his increased latenesses and absences were the result of his cervical dystonia and extreme stress from caring for his mother in her final days.

141.    Defendants retaliated against Starr by terminating him for taking FMLA approved leave when suffering from cervical dystonia tremors, which were particularly extreme in the weeks leading to his termination because of his mother's terminal condition.

142.    Starr was terminated due to his own disability, his taking of leave to cope with his disability, and his association with his mother, an individual with a disability.

### FIRST CLAIM
### (ADA – Disability Discrimination)

143.    Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

144.    Defendant NYU was Plaintiff's employer within the meaning of the ADA.

145.    Plaintiff has a disability as defined under the ADA.

146.    Plaintiff is an otherwise qualified individual with a disability who could perform the essential duties of his job with the accommodation of intermittent leave.

147.    Prior to his termination, NYU knew that Plaintiff was, or perceived him to be, disabled due to his cervical dystonia.

148.    NYU intentionally discriminated against Plaintiff because of his actual or perceived disability by terminating his employment due to latenesses and absences that were the result of his disability and use of leave given as an accommodation for his disability, in violation of the ADA.

149.    NYU acted maliciously and/or with reckless indifference to Plaintiff's rights under the ADA.

150.    As a result of NYU's discriminatory conduct, Starr suffered and continues to suffer damages, and is entitled to declaratory and injunctive relief, compensatory and punitive damages, and reasonable attorneys' fees and costs.

## SECOND CLAIM
### (NYCHRL – Disability Discrimination)

151.    Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

152.    The NYCHRL prohibits employers from discharging an employee due to the "actual or perceived . . . disability . . . of any person." N.Y.C. Admin. Code § 8-107(1).

153.    Defendants were Plaintiff's employers within the meaning of the NYCHRL.

26

154.   Plaintiff has a disability as defined in the NYCHRL, N.Y.C. Admin. Code § 8-102(16).

155.   Plaintiff is an otherwise qualified individual with a disability who could perform the essential duties of his job with the accommodation of intermittent leave.

156.   Defendants knew that Starr was, or perceived him to be, disabled prior to his termination.

157.   Defendants discriminated against Starr because of his disability by terminating his employment due to latenesses and absences that were the result of his disability and use of leave given as an accommodation for his disability, in violation of the NYCHRL.

158.   Defendants acted willfully and/or recklessly, amounting to a conscious disregard of Plaintiff's rights under the NYCHRL.

159.   As a result of Defendants' discriminatory conduct, Starr suffered and continues to suffer damages, and is entitled to declaratory and injunctive relief, compensatory and punitive damages, and reasonable attorneys' fees and costs.

## THIRD CLAIM
### (NYCHRL – Aiding and Abetting Disability Discrimination)

160.   Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

161.   The NYCHRL makes it unlawful for "any person to aid, abet, incite, compel or coerce the doing of any" unlawful discriminatory act, or attempt to do so. N.Y.C. Admin. Code § 8-107(6).

162.   Defendants Tawil-Souri and Scharnweber did or attempted to aid, abet, incite, and/or compel the above discriminatory conduct, in violation of the NYCHRL.

163.    Tawil-Souri and Scharnweber acted willfully and/or recklessly, amounting to a conscious disregard of Plaintiff's rights under the NYCHRL.

164.    As a result of Tawil-Souri and Scharnweber's discriminatory conduct, Starr suffered and continues to suffer damages, and is entitled to declaratory and injunctive relief, compensatory and punitive damages, and reasonable attorneys' fees and costs.

## FOURTH CLAIM
### (NYSHRL – Disability Discrimination)

165.    Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

166.    The NYSHRL makes it unlawful for covered employers, such as Defendants, "because of an individual's . . . disability . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment." N.Y. Exec. Law § 296(1)(a).

167.    Plaintiff was Defendants' employee within the meaning of the NYSHRL. N.Y. Exec. Law § 292(6).

168.    Plaintiff is disabled as defined in the NYSHRL.  N.Y. Exec. Law § 292(21).

169.    Starr is an otherwise qualified individual with a disability who could perform the essential duties of his job with the accommodation of intermittent leave.

170.    Defendants knew Starr suffered from a disability.

171.    Defendants discriminated against Plaintiff by terminating his employment on the basis of his disability, in violation of the NYSHRL.

172.    As a result of Defendants' discriminatory conduct, Starr suffered and continues to suffer damages and is entitled to declaratory and injunctive relief, compensatory damages, and reasonable attorneys' fees and costs.  N.Y. Exec. Law § 297.

### FIFTH CLAIM
### (NYSHRL - Aiding and Abetting Disability Discrimination)

173.    Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

174.    The NYSHRL makes it unlawful for "any person to aid, abet, incite, compel or coerce the doing of any" unlawful discriminatory act, or the attempt to do so. N.Y. Exec. Law § 296(6).

175.    Defendants Tawil-Souri and Scharnweber did and/or attempted to aid, abet, incite, and/or compel the above discriminatory conduct, in violation of the NYSHRL.

176.    As a result of Tawil-Souri and Scharnweber's discriminatory conduct, Starr suffered and continues to suffer damages, and is entitled to declaratory and injunctive relief, compensatory damages, and reasonable attorneys' fees and costs.

### SIXTH CLAIM
### (ADA – Associational Disability Discrimination)

177.    Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

178.    Plaintiff's mother was disabled due to a terminal lung cancer diagnosis.

179.    At all relevant times, NYU knew that Plaintiff's mother was disabled.

180.    NYU intentionally discriminated against Plaintiff by terminating him because he took leave and would be distracted due to his mother's actual or perceived disability, in violation of the ADA.

29

181.    NYU acted maliciously and/or with reckless indifference to Plaintiff's rights under the ADA.

182.    As a result of NYU's discriminatory conduct, Starr suffered and continues to suffer damages, and is entitled to declaratory and injunctive relief, compensatory and punitive damages, and reasonable attorneys' fees and costs.

**SEVENTH CLAIM**
**(NYCHRL – Associational Disability Discrimination)**

183.    Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

184.    At all times relevant, Starr's mother was disabled as defined in the NYCHRL due to a terminal cancer diagnosis.

185.    Defendants knew, or perceived, Starr's mother to be disabled.

186.    Defendants terminated Plaintiff because he took leave and assumed he would be distracted due to his mother's actual or perceived disability, in violation of the NYCHRL.

187.    Defendants acted willfully and/or recklessly, amounting to a conscious disregard of Plaintiff's rights under the NYCHRL.

188.    As a result of Defendants' discriminatory conduct, Starr suffered and continues to suffer damages, and is entitled to declaratory and injunctive relief, compensatory and punitive damages, and reasonable attorneys' fees and costs.

**EIGHTH CLAIM**
**(NYCHRL – Aiding and Abetting Associational Disability Discrimination)**

189.    Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

30

190.   The NYCHRL makes it unlawful for "any person to aid, abet, incite, compel or coerce the doing of any" unlawful discriminatory act, or attempt to do so. N.Y.C. Admin. Code § 8-107(6).

191.   Defendants Tawil-Souri and Scharnweber did or attempted to aid, abet, incite, and/or compel the above associational discrimination, in violation of the NYCHRL.

192.   Tawil-Souri and Scharnweber acted willfully and/or recklessly, amounting to a conscious disregard of Plaintiff's rights under the NYCHRL.

193.   As a result of Tawil-Souri and Scharnweber's discriminatory conduct, Starr suffered and continues to suffer damages, and is entitled to declaratory and injunctive relief, compensatory and punitive damages, and reasonable attorneys' fees and costs.

**NINTH CLAIM**
**(NYSHRL – Associational Disability Discrimination)**

194.   Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

195.   The NYSHRL makes it unlawful for covered employers, such as Defendants, "because of an individual's . . . disability . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment." N.Y. Exec. Law § 296(1)(a).

196.   The NYSHRL's anti-discrimination provisions have been interpreted to prohibit discrimination against an employee because of his or her association with a disabled individual. *Chiara v. Town of New Castle*, 126 A.D.3d 111, 122, 2 N.Y.S.3d 132, 140 (N.Y. App. Div. 2015)

31

197.   Plaintiff was Defendants' employee within the meaning of the NYSHRL. N.Y. Exec. Law § 292(6).

198.   At all times relevant, Starr's mother was disabled as defined in the NYSHRL due to a terminal cancer diagnosis. N.Y. Exec. Law § 292(21).

199.   Defendants knew Starr's mother suffered from a disability.

200.   Defendants terminated Plaintiff on the basis that he took excessive leave and would be distracted due to his mother's actual or perceived disability in violation of the NYSHRL.

201.   As a result of Defendants' discriminatory conduct, Starr suffered and continues to suffer damages and is entitled to declaratory and injunctive relief, compensatory damages, and reasonable attorneys' fees and costs. N.Y. Exec. Law § 297.

### TENTH CLAIM
### (NYSHRL – Aiding and Abetting Associational Disability Discrimination)

202.   Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

203.   The NYSHRL makes it unlawful for "any person to aid, abet, incite, compel or coerce the doing of any" unlawful discriminatory act, or the attempt to do so. N.Y. Exec. Law § 296(6).

204.   Defendants Tawil-Souri and Scharnweber did or attempted to aid, abet, incite, and/or compel the above associational discrimination, in violation of the NYSHRL.

205.   As a result of Tawil-Souri and Scharnweber's discriminatory conduct, Starr suffered and continues to suffer damages, and is entitled to declaratory and injunctive relief, compensatory damages, and reasonable attorneys' fees and costs.

32

## ELEVENTH CLAIM
### (FMLA – Interference)

206.    Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

207.    Defendants were Plaintiff's employers within the meaning of the FMLA.

208.    Plaintiff was entitled to FMLA leave and, accordingly, Defendants granted him FMLA leave due to his serious health condition.

209.    While receiving FMLA leave, Defendants singled out and disciplined Plaintiff for absences and lateness that were directly tied to his serious health condition and need for FMLA leave.

210.    Defendants knew that Plaintiff's absences and lateness that were directly tied to his serious health condition and need for FMLA leave, yet nevertheless discouraged him from taking that leave.

211.    Defendant NYU, by actions of its agents Scharnweber and Tawil-Souri, willfully and/or with reckless disregard interfered with Plaintiff's exercise of his rights under the FMLA, causing Plaintiff stress that exacerbated his cervical dystonia.

212.    As a result of Defendants' violations of the FMLA, Plaintiff is entitled to compensatory and liquidated damages, reasonable attorney's fees and costs, and pre- and post-judgment interest.

## TWELVTH CLAIM
### (NYCHRL – Interference with Protected Rights)

213.    Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

214.    The NYCHRL makes it unlawful for "any person to coerce, intimidate, threaten or interfere with," or attempt to do so, "any person in the exercise or

33

enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section." N.Y.C. Admin. Code § 8-107(19).

215.    Defendants Tawil-Souri and Scharnweber did or attempted to intimidate, threaten, or interfere with Plaintiff's enjoyment of his reasonable accommodation of intermittent leave for his disability, in violation of the NYCHRL.

216.    Tawil-Souri and Scharnweber acted willfully and/or recklessly, amounting to a conscious disregard of Plaintiff's rights under the NYCHRL.

217.    As a result of Tawil-Souri and Scharnweber's discriminatory conduct, Starr suffered and continues to suffer damages, and is entitled to declaratory and injunctive relief, compensatory and punitive damages, and reasonable attorneys' fees and costs.

## THIRTEENTH CLAIM
### (FMLA – Retaliation)

218.    Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

219.    Defendants were Plaintiff's employers within the meaning of the FMLA.

220.    Plaintiff was entitled to FMLA leave and, accordingly, was granted FMLA leave by Defendants due to Plaintiff's serious health condition.

221.    While receiving FMLA leave, Plaintiff was singled out and disciplined for absences and lateness that were directly tied to his serious health condition and need for FMLA leave.

222.    Defendants knew that Plaintiff's absences and lateness were directly tied to his serious health condition and need for FMLA leave.

223.    Plaintiff was terminated because he took intermittent time off to address his serious health condition.

224.    Defendants willfully retaliated against Plaintiff by firing him as a result of his absences taken to treat his serious health condition while on intermittent FMLA leave, in violation of the FMLA.

225.    As a result of Defendants' retaliation, Plaintiff suffered and continues to suffer damages and is entitled to compensatory and liquidated damages, reasonable attorney's fees and costs, and pre- and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a.      declaring that the acts and practices complained of herein are in violation of the ADA, FMLA, NYCHRL, and NYSHRL;

b.      enjoining and permanently restraining these violations of the ADA, FMLA, NYCHRL, and NYSHRL;

c.      directing Defendants to reinstate Plaintiff in the position Plaintiff would be in but for its discriminatory and unlawful acts, and to make Plaintiff whole for all earnings he would have received but for Defendants' discriminatory and unlawful treatment, including, but not limited to, wages, health insurance and other fringe benefits, bonuses, pension, front-pay, and other lost employment benefits;

d.      directing Defendants to pay Plaintiff compensatory damages for, *inter alia*, mental anguish, emotional distress, and humiliation;

e.      directing Defendants to pay Plaintiff punitive damages for their willful disregard of and/or reckless indifference to Plaintiff's rights;

35

f.      awarding Plaintiff liquidated damages equal to amounts awarded as compensatory damages under the FMLA;

g.      awarding Plaintiff the costs of this action together with reasonable attorneys' fees and costs;

h.      awarding Plaintiff pre- and post-judgment interest; and

i.      awarding such other and further relief as this Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated:  New York, New York
        May 8, 2018

PECHMAN LAW GROUP PLLC

By: _____
        Louis Pechman
        Laura Rodriguez
        Lillian M. Marquez
        488 Madison Avenue – 17th Floor
        New York, New York 10022
        (212) 583-9500
        pechman@pechmanlaw.com
        rodriguez@pechmanlaw.com
        marquez@pechmanlaw.com
        *Attorneys for Plaintiff*